JUDGE TORRES

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MEDICREA USA, Inc. |  |
| Plaintiff | CIVIL ACTION NO.: _____ |
| v. | |
| K2M SPINE, INC.<br>CHAD JACKSON, THOM THOMAS,<br>LAUREN BROWN, WILLIAM HAIGH, and<br>KINETIC SURGICAL, INC., | **COMPLAINT** |
| Defendants | **JURY TRIAL DEMANDED** |

RECEIVED
NOV 03 2017
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff Medicrea USA, Inc. ("Medicrea") is an emerging manufacturer of spinal devices, including UNiD™ -- the first and only patient-specific spinal rod approved by the Food and Drug Administration ("FDA") for use in the United States.   While employed as sales representatives by Medicrea, Defendants Chad Jackson ("Jackson"), Thom Thomas ("Thomas"), Lauren Brown ("Brown"), and William Haigh ("Haigh") (collectively the "Sales Employee Defendants") were all well compensated employees who had access to confidential, proprietary, and trade secret information.  Jackson, Thomas, Brown and Haigh represent 27% of Medicrea's sales force, were responsible for 19% of Medicrea's sales during 2016, and worked directly with many of Medicrea's largest customer-surgeons.  In exchange for the significant compensation, resources, and training Medicrea provided to the Sales Employee Defendants, Medicrea required

1

each of the Sales Employee Defendants to enter into agreements that are intended to protect Medicrea's proprietary technology, confidential information and trade secrets.

K2M Spine, Inc. ("K2M"), is a manufacturer of spinal devices that directly compete with Medicrea. However, K2M does not manufacture or sell a patient-specific spinal rod capable of competing with Medicrea's UNiD™. To shortcut the time, effort, and money required to launch its own FDA-approved patient-specific spinal rod, K2M decided instead to steal Medicrea's business by raiding its workforce and encouraging the employees it hired away from Medicrea to breach their employment agreements with Medicrea. Specifically, K2M has misappropriated the confidential information and trade secrets entrusted to the Sales Employee Defendants, including, but not limited to, the numerous refinements Medicrea has made regarding the UNiD™ patient-specific rod, and the reasons for those modifications (which include feedback from Medicrea's customer-surgeons who worked directly with the Sales Employee Defendants). K2M has also induced the Sales Employee Defendants to solicit Medicrea's customer-surgeons, including customer-surgeons they worked with directly on surgeries using Medicrea's UNiD™ rod. Just recently, K2M's exclusive sales distributor and alter ego, Kinetic Surgical, Inc. ("Kinetic"), unintentionally disclosed K2M's true intentions in an email to Brown, <u>while she was still employed at Medicrea</u>. That email plainly revealed that K2M's goal in recruiting and hiring the Sales Employee Defendants was to "*convert [] business from Medicrea*" to K2M. Such conduct violates numerous contractual obligations and legal duties.

Medicrea seeks injunctive relief and an award of monetary damages against K2M, the Sales Employee Defendants, and Kinetic for conspiring to unfairly destroy Medicrea's business by: raiding Medicrea's key sales and engineering employees; breaching the Sales Employee Defendants' non-competition and non-solicitation agreements with Medicrea; tortiously

interfering with those arrangements; and misappropriating Medicrea's confidential and trade secret information.

## I. PARTIES

1.      Plaintiff Medicrea USA, Inc. is a Delaware corporation with its principal place of business at 50 Greene Street, New York, New York 10013.   Medicrea is a wholly-owned subsidiary of Medicrea International, based in Lyon, France.

2.      Defendant K2M Spine, Inc. is a publicly-traded Delaware corporation with its principal place of business at 600 Hope Parkway SE, Leesburg, Virginia.   K2M's registered agent in New York is Corporation Services Company, 80 State Street, Albany, New York 12207-2543.

3.      Defendant Jackson is an individual citizen and resident of the State of New York who may be served at his residential address, 71 Broadway, Apartment 4G, New York, New York 10006.

4.      Defendant Brown is an individual citizen and resident of the State of California who may be served at her residential address, 2726 Sandpiper Drive, Costa Mesa, California 92626.

5.      Defendant Haigh is an individual citizen and resident of the State of California who may be served at his residential address, 16642 Blanton Lane, Apartment C, Huntington Beach, California 92649.

6.      Defendant Thomas is an individual citizen and resident of the State of Wisconsin who may be served at this residential address, 145 Bayberry Court, Hudson, Wisconsin 54016.

7.      Defendant Kinetic Surgical, Inc., is a California corporation with its principal place of business at 2461 North Highwood Road, Orange, California 92867; which is believed to

be the primary residence of Kinetic's founder Joseph Furtek.   Since around the time of its incorporation in February 2016, Kinetic has been the exclusive sales distributor of K2M's products in Southern California.

## II.  JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over Medicrea's federal trade secrets claim pursuant to 18 U.S.C. §§ 1836-39 *et seq*. and 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over Medicrea's state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

9.      Venue is proper because a substantial part of the events or omissions giving rise to Medicrea's claims occurred in this Judicial District.  28 U.S.C. § 1391(b) (2).

## III.  FACTS

### A.      Medicrea is the Leader in Patient-Specific Spinal Rods

10.     Medicrea develops, markets, sells, and supports products for the treatment of spinal disease, disorders, deformities, and injuries, including spinal implants, external fixation devices, related surgical instrumentation, and other complimentary surgical products.  Spinal implant systems are used in spinal surgeries to stabilize and fuse segments of the spine.  Spinal implant systems include interbody cages, rods, plates, and the specialized screws used to affix these products to human bone.

11.     Medicrea is a pioneer and global leader in the development, manufacturing, and sale of patient-specific spinal implants.

12.     Medicrea's products include its industry-leading product UNiD™, the first and only patient-specific spinal rod approved by the Food and Drug Administration ("FDA") for use in the United States.

13.     With UNiD™, surgeons can more precisely achieve their surgical goals because the rods are personalized to the specific patient and surgeon's technique and accurately curved for the patient using a design established by the surgeon during the pre-operative planning phase.

14.     The UNiD™ rod is pre-contoured to the precise make-up of each individual patient's spine. This patient-specific technology revolutionizes spinal surgery by eliminating the need, present with all other spinal rods on the market, for surgeons to manually bend the rod during surgery, which can create indentations or notches in the rod that are an acknowledged cause of increased post-operative rod failure. By eliminating the manual bending of rods during surgery, surgeons also can significantly reduce operating time, thereby reducing the risk of infections and shortening post-operative recovery.

15.     Medicrea received FDA approval for the UNiD™ patient-specific rod in November 2014, and the first surgery in the United States was performed later that year at New York University's Langone Medical Center.

16.     Since 2014, UNiD™ has been used in more than 900 surgeries across the United States and 1,800 surgeries worldwide, and Medicrea has generated in excess of $17 million in revenue from United States sales of UNiD™ rods and related components.

17.     Medicrea has devoted substantial time and resources, over many years, to developing and refining the UNiD™ patient-specific rod, and the process for working with spinal surgeons to design, manufacture and surgically-implant the UNiD™ patient-specific rod.

18.     The spinal device industry is extremely competitive. Medicrea competes directly with numerous spinal device manufacturers, both domestically and internationally, including but not limited to Defendant K2M.

B.     **K2M is Attempting to Enter the Patient-Specific Spinal Rod Market**

19.     K2M manufactures and sells products that compete directly with Medicrea, including spinal implants, personalized spinal fusion products, and related surgical instruments.

20.     K2M is substantially larger than Medicrea, in terms of annual revenue, numbers of sales employees, numbers of products for sale in the United States.

21.     K2M does not, however, have approval from the FDA to manufacture, market, sell, or distribute in the United States a patient-specific spinal rod to compete with Medicrea's UNiD™; however, upon information and belief, K2M is actively developing its own patient-specific spinal rod for sale and use in the United States in the near future, perhaps as soon as in 2018.

22.     Presently, K2M manufactures and sells spinal rods that surgeons must manually bend during surgery, typically using a device known as a "French Bender," to attempt to achieve the proper fit to the patient's spine.

23.     K2M's current products also include BACS™, which it began marketing in February 2017 as offering patient-specific 3D-printed anatomical models of the spine to aid in visualization of patient anatomy.  BACS™, however, is not a spinal implant, and is certainly not a patient-specific spinal rod like Medicrea's UNiD™.

24.     Medicrea enjoys a significant business advantage over K2M, and its other competitors in the spinal device industry, by virtue of being the first and only device manufacturer approved by the FDA to manufacture and sell a patient-specific spinal rod (UNiD™) for use in the United States.

25.     Medicrea has devoted substantial money, time, energy, and resources to develop its industry-leading UNiD™ product, and to develop and refine the interactive process of

working with spinal surgeons to design, and surgically implant, the UNiD™ rods for their patients.

26.     From November 2016 through the present, K2M has attempted to unfairly eliminate Medicrea's competitive advantage created by its UNiD™ product, and to otherwise destroy Medicrea's business.

27.     Through its hiring of the Sales Employee Defendants, K2M now has access to confidential information and trade secrets about Medicrea's UNiD™ and the surgical technique of key surgeons who use Medicrea's UNiD™.  Such information is of substantial value to K2M in developing and selling its own patient-specific rod to compete with Medicrea's UNiD™.

      **C.**    **Medicrea's Innovative Process for Manufacturing and Selling the UNiD™ Patient-Specific Spinal Rod**

28.     Medicrea, like K2M, sells and distributes its spinal products through direct employed sales representatives and through third-party sales organizations, known as distributors (collectively referred to herein as "sales representatives").

29.     Sales representatives for Medicrea and K2M compete head-to-head in the same hospitals and medical facilities for business of the same surgeons, both domestically and abroad.

30.     Because the UNiD™ rod is custom designed for each individual patient, the manufacturing and sales process for UNiD™ is substantially more complex than with traditional, non-customized spinal implants.

31.     For example, as part of the UNiD™ sales process, Medicrea's sales representatives, working directly with customer surgeons and Medicrea engineers, perform the following important steps:

        a.    Collecting and refining the patient-specific spinal data (including properly calibrated radiological images of the patient's spine) that is required to manufacture the UNiD™ rod;

b.   Collecting and refining the surgeon's plan for the individual patient's spinal surgery (which includes data such as the desired length for the spinal rod, the location along the spine where the rod will be affixed, the method the surgeon will use to affix the rod to the spine, and other spinal corrections the surgeon intends to perform);

c.   Reviewing the detailed plan which is the outcome of the computer model (also known as a "Case Memo") that Medicrea engineers produce of the Medicrea UNiD™ rod to be manufactured, based upon the patient's specific data, the surgeon's individual plan, and the desired surgical outcomes.

d.   Delivering to the hospital for sterilization and surgical implantation the UNiD™ patient-specific rod that Medicrea's engineers in France manufacture following the surgeon's approval of the Case Memo;

e.   Delivering to the hospital for sterilization and surgical implantation the surgical kit containing a variety of connectors that the surgeon will use to affix the UNiD™ rod to the patient's spine;

f.   Attending the surgery and reviewing with the surgeon the steps in the surgical plan, recording any deviations from that plan, and answering the surgeon's product-specific questions;

g.   Eliciting feedback from the surgeon on their experiences using the UNiD™ rod, including suggested revisions to the UNiD™ rod and future surgical plans; and

h.   Participating with the surgeon and Medicrea's engineers in the review of the post-surgical analysis.

32.    Medicrea invests substantial time and resources in training its sales representatives on this highly-technical process for the UNiD™ patient-specific spinal rod, as well as on the various connectors used to affix the UNiD™ rod to the patient's spine.

33.    All sales transactions are between Medicrea and the hospitals or medical facilities that actually purchase the products for use by the hospital's surgeons. Pricing for Medicrea's

spinal products is negotiated and established by contract with the hospitals and Medicrea always seeks to maintain those sales terms on a confidential basis.

34.     In addition to the responsibilities described above, Medicrea's sales representatives, including the Sales Employee Defendants, negotiate directly with the hospitals and medical facilities they cover on the prices they are charged for Medicrea's products, including for the UNiD™ patient-specific spinal rod.  Sales representatives also receive copies of the invoices that Medicrea sends to the hospitals and medical facilities they cover.

35.     By virtue of their work on behalf of Medicrea, Medicrea sales representatives are provided a wealth of confidential information and trade secrets about Medicrea's products, processes, customers and business, including, but not limited to, information on:

a.     Product and process design and development, including the highly technical process for designing, manufacturing, and surgically implanting the UNiD™ patient-specific rod;

b.     Product performance;

c.     Surgeon feedback about their experiences using Medicrea products;

d.     Experiences that have led and will continue to lead to Medicrea's refinement of its products and processes, including UNiD™;

e.     Product pricing and distribution data;

f.     Medicrea's current and future sales and marketing strategies;

g.     Hospital and surgeon purchasing patterns and histories; and

h.     New products which are in the design, prototype, or FDA-approval process.

### D.   Medicrea's Relationship with the Sales Employee Defendants

36.     Jackson, Thomas, Brown, and Haigh represented Medicrea products in territories covering various medical facility and hospital accounts across the United States, including in New York, and the surgeon customers with privileges or practicing at those accounts.

37.     Jackson served as a Medicrea sales representative, known as a "Spine Deformity Consultant," from April 21, 2015 through November 14, 2016.

38.     Jackson was responsible for accounts and territory covering the New York area, including the New York metropolitan area, as well as parts of Connecticut and New Jersey.  The accounts Jackson serviced on behalf of Medicrea included, but were not limited to: Hospital for Special Surgery; NYU Langone Orthopedic Hospital (formerly known as Hospital for Joint Diseases); Columbia University Medical Center; Crouse Hospital; Montefiore Medical Center; Tisch Hospital; Stony Brook University Hospital; Stony Brook Children's Hospital; Stony Brook Southampton Hospital; and Stamford (Connecticut) Hospital.

39.     Thomas served as Medicrea's National Sales Trainer, a position based in New York City, from June 6, 2016 through November 2016.

40.     As Medicrea's National Sales Trainer, Thomas was responsible for training all of Medicrea's sales representatives in the United States on: (a) the design and use of Medicrea's products, including the highly technical end-to-end process for designing and manufacturing the UNiD™ patient-specific rod; (b) product performance; (c) product pricing; and (d) Medicrea's sales and marketing strategies; (e) refining Medicrea's sales messaging based on the feedback from the sales and marketing teams.

41.     From September 2016 through November 2016, Thomas was responsible for organizing and hosting all visits by spinal surgeons to Medicrea's U.S. headquarters in New

York, the primary purpose of which was to demonstrate to surgeons the end-to-end process of UNiD™ and its benefits.

42.     Following Jackson's resignation from Medicrea, Thomas requested to take-over Jackson's role as a sales representative responsible for accounts and territory covering the New York area, including the entire Southern District of New York.

43.     Thomas' request was granted and he served in Jackson's former sales representative position until he resigned on May 3, 2017.

44.     As a Medicrea sales representative, Thomas was responsible for accounts and territory covering the New York area, including the entire Southern District of New York.  The accounts Thomas serviced on behalf of Medicrea included, but were not limited to:  Hospital for Special Surgery; Hospital for Joint Diseases; NYU Langone Medical Center; Columbia University Medical Center; Crouse Hospital; Montefiore Medical Center; Tisch Hospital; Stony Brook University Hospital; Stony Brook Children's Hospital; Stony Brook Southampton Hospital; and Stamford (Connecticut) Hospital.

45.     Brown served as a Medicrea sales representative, known as a "Spine Deformity Consultant," from January 14, 2013 through September 30, 2017.

46.     Brown was responsible for accounts and territory covering Southern California, with a focus on Orange County, California.  Brown's responsibilities also extended to the entire West Coast of the United States, when she was asked by her manager to cover surgeries, or meet with surgeons, on the West Coast but outside of Southern California.  The accounts Brown serviced on behalf of Medicrea included, but were not limited to: Banner Desert Medical Center; Banner Good Samaritan; Children's Hospital- Madera; Children's Hospital in Los Angeles (CHLA Hospital); Children's Hospital in OC (CHOC Hospital); Eisenhower Medical Center;

Hoag Orthopedic Institute; Huntington Memorial Hospital; Marina Del Rey; Mission Hospital Laguna Beach; Mission Hospital Viejo; Northridge Medical Center; Saddle Back Memorial Laguna Hills; Scripps Memorial Hospital – La Jolla; Silver Lake Medical Center; Sky Ridge Medical Center; St Joseph Hospital – Orange County; St Joseph Hospital and Medical Center Phoenix; St Jude Fullerton; Surgical Center of Castle Rock; UCI Medical Center; UCSF Medical Center; University of Washington; Valley's Children Hospital; and Westside Surgical Hospital.

47.     During her employment with Medicrea, Brown attended company meetings, on multiple occasions, Medicrea's U.S. headquarters in New York.  For example, Brown personally attended Medicrea's national sales meetings held twice a year at the U.S. headquarters in New York.  Additionally, before being offered employment at Medicrea, Brown was interviewed by Medicrea executives at the U.S. headquarters in New York.  Brown also spent time at Medicrea's global headquarters in France.

48.     Haigh served as a Medicrea sales representative, in particular as an "Associate Spine Deformity Consultant," from September 19, 2016 through September 30, 2017.

49.     As an Associate Spine Deformity Consultant, Haigh's responsibilities, on a day-to-day basis, was to assist Brown; including, but not limited to, preparing for, and attending, spinal surgeries as directed by Brown.  Beginning in January 2017, Haigh's role was expanded to include serving as Medicrea's lead sales representative for Dr. Samuel Rosenfeld.

50.     Haigh was compensated by Medicrea based upon the sales credited to Brown.

51.     During his employment with Medicrea, Haigh attended at least one meeting held at Medicrea's U.S. headquarters in New York.

52.     During their employment with Medicrea, Brown and Haigh communicated on nearly a daily basis, via email and/or telephone, with Medicrea's U.S. headquarters in New York

to, among other things: schedule surgical cases, order products and equipment, work with Medicrea's U.S. engineers on the designing and delivery of UNiD™ patient-specific rods, and on other marketing matters.

53.     As sales employees representing exclusively Medicrea products, Jackson, Thomas, Brown, and Haigh were responsible for, among other things: soliciting sales of Medicrea products from hospital and medical facilities in their territories; working closely with surgeons and Medicrea engineers in New York, New York and Lyon, France on the process for designing and surgically-implanting UNiD™ patient-specific rods; attending spinal surgeries; servicing surgeon customers; and assisting to process sales through Medicrea's corporate office in New York.

### E.     Medicrea's Agreements with the Sales Employee Defendants

54.     Because the Sales Employee Defendants would, on a regular basis, be receiving Medicrea confidential information and trade secrets and would be relying on Medicrea's goodwill and products to perform their job, and as a condition of their employment, they each executed a Non-Competition and Confidentiality Agreement ("Non-Compete/Confidentiality Agreement") with Medicrea prior to commencing employment, which provides for certain non-competition, non-disclosure, and non-solicitation obligations.  True and accurate copies of these Agreements are attached as Exhibits A through D.  For privacy reasons, the specific compensation amounts in the offer letters attached to Exhibits A through D have been redacted.

55.     Under the "CONFIDENTIALITY" section of the Non-Compete/Confidentiality Agreement, the Sales Employee Defendants each agreed:

> without any limitation in time not to disclose to third parties confidential information concerning MEDICREA USA and its business activities.

> "Confidential Information," as used in this provision, means any information – technical, commercial with current or potential customers, or of any other nature – regardless of whether or not the information is documented, with the exception of information which is or becomes generally known or which has come or comes to general knowledge other than through the Employee's breach of this provision.

56.     Under the "NON-COMPETITION" section of the Non-Compete/Confidentiality Agreement, the Sales Employee Defendants each agreed:

> not to, directly or indirectly, during your employment and for a period of one (1) year after the termination of your employment by MEDICREA USA, solicit or attempt to solicit any of the Company's employees, customers, agents, distributors, suppliers or other business partners, away from the Company.

57.     Under the "NON-COMPETITION" section of the Non-Compete/Confidentiality Agreement, the Sales Employee Defendants each further agreed:

> during your period of employment and for a period of one year after the termination of your employment not to, directly or indirectly, conduct or in any manner participate to further activities, which compete with the present, or future business activities of the Company, within your area of responsibility, at the time of termination.

58.     Under the "NON-COMPETITION" section of their Non-Compete/Confidentiality Agreements, Jackson, Thomas, Brown, and Haigh further agreed that their territory would include, but not be limited to:

> any surgeon in the USA with whom you had a face to face meeting or with whom you did cover a surgery during the last 12 months.

**F.      The Sales Employee Defendants Had Access to Medicrea's Closely Guarded Trade Secrets and Confidential Information**

59.     As sales employees of Medicrea, Jackson, Thomas, Brown, and Haigh each had access to, and acquired, confidential information about Medicrea's business, including confidential information regarding:

    a.    Product and process design and development, including the highly technical process for designing, manufacturing, and surgically implanting the UNiD™ patient-specific rod;

    b.    Product performance;

    c.    Experiences of customer surgeons using Medicrea products;

    d.    Medicrea's current and future sales and marketing strategies;

    e.    Hospital and surgeon purchasing patterns and histories; and

    f.    New products which are in the design, prototype, or FDA-approval process.

60.    Jackson, Thomas, Brown, and Haigh also each received confidential product pricing information for Medicrea products on an ongoing basis each time they submitted orders for sales of Medicrea products with the corporate offices.

61.    Jackson, Thomas, Brown, and Haigh also received confidential information, on an ongoing basis, about customer surgeons' particular experiences designing and using the UNiD™ patient-specific rod, and the specific refinements prompted by those surgeon's experiences.  By way of several examples:

    a.    In September 2015, Jackson received confidential information related to a refinement Medicrea made to certain laser markings on UNiD™ rods, and he was included in confidential discussions between Medicrea engineers and senior executives regarding that refinement. This refinement was prompted, in part, by confidential feedback that a customer-surgeon provided to Medicrea (including to Jackson) following UNiD™ surgical cases covered by Jackson.

    b.    In November 2016, Brown received confidential information related to Medicrea's refinement to the process for verifying the diameter of UNiD™ rods following the manufacturing process.  This refinement was prompted, in part, by confidential feedback that a customer-surgeon provided to Medicrea (including to Brown) following a UNiD™ surgical case covered by Brown; and

    c.    In July 2017, Brown and Haigh received confidential information related to Medicrea's refinement of the length of UNiD™ rods designed for neuromuscular patients.  This refinement was prompted, in part, by

confidential feedback that a customer-surgeon provided to Medicrea (including to Brown and/or Haigh) following UNiD™ surgical cases covered by Brown and/or Haigh.

62. During their service as Medicrea sales representatives, Jackson, Thomas, Brown, and Haigh worked directly with customer-surgeons and Medicrea engineers in New York and France on the confidential process for designing, and then surgically implanting, the UNiD™ patient-specific rod in collectively nearly 200 patients. Those customer-surgeons included, but were not limited to, the number one and number four highest user of the UNiD™ patient-specific rod in the United States.

63. Specifically, the Sales Employee Defendants worked directly with the following Medicrea customer-surgeons on UNiD™ cases, and were paid commissions by Medicrea for those cases:

    a.    Brown worked directly with Drs. Michael Eliot, Afshin Aminian, Kim Keun-Young, Ejovi Ughwanogho, Reginald Fayssoux, Raed Ali, Samuel Rosenfeld, Zafar Khan, Joe Lee, Yu-Po Lee, and Steven Dennis;

    b.    Jackson worked directly with Drs. Frank Schwab, Peter Passias, Ashish Patel, Themistocles Protopsaltis, John Labiac, Hanjo Kim, John Bianco, Roger Widmann, Jamie Gomez, Aaron Buckland, Raphael Davis, Michael Smith, Thomas Errico, Ashish Patel, and Charla Fisher;

    c.    Thomas worked directly with Drs. Frank Schwab, Peter Passias, Themistocles Protopsaltis, John Labiac, Raphael Davis, and Aaron Buckland; and

    d.    Haigh, in his role as Brown's assistant, worked directly with Drs. Afshin Aminian and Samuel Rosenfeld.

64. As Medicrea sales employees, Jackson, Thomas, Brown, and Haigh had access to a restricted on-line library of confidential materials that includes, but is not limited to: Medicrea

product information, including information about UNiD™; sales data; information about Medicrea's surgeon customers; and Medicrea training materials.

65.     Medicrea maintains a Code of Business Conduct and Ethics Policy ("Ethics Policy"), which applies to all Medicrea employees.  That Policy contains provisions requiring employees to protect Medicrea's confidential information and intellectual property.

### G.     Chronology of K2M's Raiding of Key Medicrea Employees

66.     Beginning in November 2016, K2M conspired with the Sales Employee Defendants, and Kinetic to raid Medicrea of key sales and engineering employees.  K2M has engaged in this conspiracy in an unfair effort to destroy Medicrea's business operations.

67.     On November 2, 2016, Jackson provided email notice of his resignation from Medicrea, effective November 14, 2016.

68.     Immediately following his resignation from Medicrea, and three months before K2M launched BACS™ (its competitor product to the UNiD™ process), Jackson began working for K2M as a sales representative for K2M's products, assuming the role of K2M's Manager of Northeast Complex Spine Unit.  Upon information and belief, Jackson presently serves in that same role with K2M.

69.     On May 3, 2017, Thomas provided email notice of his resignation from Medicrea, effective immediately.

70.     Immediately following his resignation from Medicrea, Thomas began working for K2M as a sales representative for K2M's products, assuming the role of K2M's Director of Complex Spine Unit - Midwest.  Upon information and belief, Jackson presently serves in that same role with K2M.

71.     On September 11, 2017, Brown and Haigh, within the span of several minutes, both provided email notice of their resignation from Medicrea, effective September 30, 2017.

72.     Immediately following their coordinated resignations from Medicrea, Brown and Haigh started working for K2M, either as employees of K2M or Kinetic, K2M's alter ego and exclusive distributor in Orange, California.

73.     Haigh's personal profile on LinkedIn™ indicates that, since October 2017, he has been employed by K2M as a "Clinical Specialist."

74.     Upon information and belief, Brown and Haigh are being paid at the higher end of the current market rates, along with receiving one-year of guaranteed compensation, to leave Medicrea and accept employment selling K2M's products.

75.     Medicrea conducted exit interviews with Brown and Haigh, during which each refused to provide any information about their new employer or the position they were taking with that employer – despite continuing to collect a salary from Medicrea, and in violation of the duties they owed to their current employer.   Medicrea reminded Brown and Haigh of their obligations to Medicrea under their Non-Compete/Confidentiality Agreements.

76.     In addition to raiding a substantial part of Medicrea's sales-force, K2M hired-away Medicrea's U.S. Field Engineer, Alexander Artaki, on January 20, 2017.

77.     As Medicrea's U.S. Field Engineer (a position based in New York City), Artaki's responsibilities included, but were not limited to: (a) serving as the lead engineer on Medicrea's currently released products; (b) managing the development of new Medicrea products by, among other things, gathering and analyzing feedback in order to expedite limited phase release of new products; (c) managing, end-to-end, all of Medicrea's custom products; and (d) reporting and meet regularly with Medicrea's Research and Development team in Lyon, France.

78.     In performance of those responsibilities, Artaki had access to, and acquired, confidential information about Medicrea's business, including confidential information regarding: (a) Medicrea's product design, development, and performance; (b) Medicrea's future product(s) design and development; and (c) the ongoing work of Medicrea's Research and Development team in Lyon, France.

79.     As with the Sales Employee Defendants, Artaki executed a Non-Competition and Confidentiality Agreement with Medicrea prior to commencing employment, which provides for certain non-competition, non-solicitation, and confidentiality obligations.  Commensurate with the fact Artaki's responsibilities as Medicrea's U.S. Field Engineer included coverage of the entire U.S. market, the "NON-COMPETITION" section of his Non-Compete/Confidentiality Agreements specifies that his territory is the United States.

## H.     The Defendants' Improper and Deceptive Competitive Activities

80.     Since at least November 2016, K2M has conspired with the Sales Employee Defendants, and Kinetic, to unfairly compete directly with Medicrea by, among other things, soliciting business from the same spinal surgeons that Jackson, Thomas, Brown, and Haigh had direct responsibility for, and ongoing contact with, while they were sales representatives of Medicrea.

### (1)     Jackson's Improper Competitive Activities

81.     Before and after his resignation from Medicrea on November 14, 2016, Jackson has worked with K2M to directly compete against Medicrea, in violation of his Non-Compete/Confidentiality Agreement.

82.     On November 2, 2016, the same day he notified Medicrea of his resignation, Jackson forwarded from his Medicrea email to his personal email two documents: (1) a Medicrea

proprietary presentation on a sales incentive program related to the UNiD™ patient-specific spinal rod; and (2) Medicrea's highly-sensitive sales results in the U.S. Market for the first quarter of 2016.

83.      Additionally, on December 1, 2016, less than three weeks after leaving Medicrea, Jackson sent an email to Dr. Thomas Errico, a spinal surgeon located in New York, New York. In that email, Jackson stated:

> Good evening Dr. Errico. Not sure if you are aware, but I've made a move over to K2M which I am ecstatic about. With that being said, a few months back when I was with Medicrea, we were going to do a "peer to peer" dinner/discussion with pre-operative planning involved with fellows and a few attendings. **I wanted to see if you would be okay, to move forward with something like that with K2, I got the go ahead on my end to arrange**, but wanted to check with you first. I hope all is well. Regards.

84.      Dr. Thomas Errico is a spinal surgeon located directly within the New York territory that Jackson was responsible for as a sales representative of Medicrea products.  Dr. Errico is affiliated with NYU Medical Center in New York, New York.

85.      As a Medicrea sales representative, Jackson personally covered surgeries that Dr. Errico performed using Medicrea products, and Medicrea paid Jackson a commission for those surgeries.

86.      Dr. Errico replied to Jackson's email by referring him to Dr. Aaron Buckland, another spine surgeon affiliated with NYU Medical Center, to schedule the "peer-to-peer dinner" that Jackson proposed in his December 1, 2016 email.

87.      Dr. Aaron Buckland is a spinal surgeon located directly within the New York territory that Jackson was responsible for as a sales representative of Medicrea products.

88.     As a Medicrea sales representative, Jackson personally covered surgeries that Dr. Buckland performed using Medicrea products, and Medicrea paid Jackson a commission for those surgeries.

89.     After Dr. Buckland proposed a date in January, 2017, Jackson replied via email dated December 2, 2016:

> So what do the dates January 4-7th look like, also although not the beginning of the month, but also January 23-27. We can do a restaurant with a private room locally, or do something at K2 corporate, but that may be difficult considering its in Virginia. Let me know your thoughts.

90.     Jackson's emails with Dr. Errico and Dr. Buckland in December 2016 plainly demonstrate that Jackson, as an employee of K2M (and with K2M's "go-ahead"), directly competed with Medicrea by soliciting business from the same surgeon customers for whom he was responsible as a Medicrea sales representative – a violation of Jackson's Non-Compete/Confidentiality Agreement with Medicrea.

91.     On December 8, 2016, Medicrea, through its attorney, sent a letter to Jackson advising him that his communication with Dr. Errico and Dr. Buckland, and his attempt to arrange a "peer-to-peer dinner" with them constitute a violation of his Non-Compete/Confidentiality Agreement with Medicrea.

92.     On December 12, 2016, counsel for K2M and Jackson responded to Medicrea disputing that Jackson's communications with Dr. Errico and Dr. Buckland violated his Non-Compete/Confidentiality Agreement with Medicrea.   K2M, nonetheless, stated that it "has instructed Mr. Jackson not to participate in the referenced peer-to-peer meeting."   Moreover, K2M disputed that Dr. Errico was covered by Jackson's Non-Compete/Confidentiality Agreement with Medicrea because, according to K2M, Dr. Errico uses K2M (and not Medicrea) products.  Accordingly, K2M stated that it had advised Jackson "not to solicit *any actual surgeon*

*customers of Medicrea* with whom Mr. Jackson had a face-to-face meeting or for whom Mr. Jackson covered a surgery during his last twelve (12) months of employment with Medicrea."

93.     However, Jackson's Non-Compete/Confidentiality Agreement with Medicrea was not, as K2M's counsel stated, limited to any *"actual surgeon customers of Medicrea."* Rather, the non-solicitation restrictions apply on their face to "any surgeon in the USA with whom you had a face to face meeting or with whom you did cover a surgery during the last 12 months."

94.     Contrary to the claims by K2M's counsel, Dr. Errico and Dr. Buckland both used Medicrea's products, including UNiD™; and Jackson personally covered surgeries involving those doctors as a Medicrea sales representative.  Moreover, at the time of his resignation, Jackson had been scheduled to cover a UNiD™ surgery by Dr. Errico at the Hospital for Joint Diseases on November 7, 2016, and a UNID™ surgery by Dr. Buckland at the Hospital for Joint Diseases on November 28, 2016.

95.     K2M's attempt in December 2016 to re-write the terms of Jackson's Non-Compete/Confidentiality Agreement with Medicrea demonstrated its disregard for Jackson's obligations to Medicrea, and its intent to conspire with Jackson, as well as other future employees hired away from Medicrea, to unfairly compete with Medicrea and to solicit business from restricted sources.

### (2)     Thomas' Improper Competitive Activities

96.     Since his resignation from Medicrea on May 3, 2017, Thomas has, as a sales employee of K2M, directly competed against Medicrea, in violation of his Non-Compete/Confidentiality Agreement.

97.     For example, on May 19, 2017, less than three weeks after leaving Medicrea, Thomas, on behalf of K2M, contacted Dr. Sunil Manjila.  Thomas requested a meeting with Dr. Manjila to solicit his business on behalf of K2M.

98.     Dr. Manjila is a spinal surgeon located in Bay City, Michigan.  On November 18 through November 19, 2016, Medicrea hosted a VIP sales meeting with Dr. Manjila in New York, New York.  At that time, Thomas was responsible for coordinating the details of, and hosting, such surgeon VIP meetings.  In that capacity, Thomas personally arranged for, and participated in, the face-to-face VIP meetings with Dr. Manjila in November 2016.

99.     Thomas' communication with Dr. Manjila plainly demonstrates that Thomas, as an employee of K2M, directly competed with Medicrea by soliciting business from the same surgeons for whom he was responsible, and personally met with, as a Medicrea employee – a violation of Thomas' Non-Compete/Confidentiality Agreement with Medicrea.

### (3)     Brown's and Haigh's Improper Competitive Activities

100.     Prior to their resignations from Medicrea on September 30, 2017, Brown and Haigh worked with K2M to compete against Medicrea, in violation of their Non-Compete/Confidentiality Agreements.

### (a)     Brown and Haigh Misuse Valuable Surgeon-Specific Information

101.     First, at some time prior to May 15, 2017, Brown and Haigh created a confidential document entitled "Dr. Rosenfeld's Neuromuscular Scoliosis Surgical Technique" ("Dr. Rosenfeld Surgical Document").  This document specifically describes Dr. Samuel Rosenfeld's surgical habits in the operating room, and his preferred technique using Medicrea's patented LigaPASS® Dual (sublaminar) bands.

102.    LigaPASS®, a band connector, is used as an anchorage point in the vertebra, when using a screw is not the preferred surgical option. LigaPASS® can be used as an anchorage point in many types of spinal surgeries, including those using Medicrea's UNiD™ patient-specific rod.  LigaPASS® was introduced by Medicrea in December 2013.

103.    Dr. Rosenfeld and Dr. Aminian have worked closely with Medicrea on the development surgical techniques for LigaPASS®. Brown covered 204 LigaPASS® surgical cases with Dr. Aminian, and Haigh covered 14 LigaPASS® surgical cases with Dr. Rosenfeld.

104.    Haigh and Brown worked closely together to create the confidential Dr. Rosenfeld Surgical Document.  For example, Haigh personally interviewed Dr. Rosenfeld to accurately capture his surgical technique and he made numerous revisions to the resulting Dr. Rosenfeld Surgical Document.  Brown extensively edited the Dr. Rosenfeld Surgical Document, providing at least 94 separate revisions, the last of which she provided on May 11, 2017.

105.    Haigh last edited the Dr. Rosenfeld Surgical Document at 12:21 PM on May 15, 2017.  That same day, Haigh forwarded a copy of that confidential document from his Medicrea email account to his personal email.

106.    Haigh had no legitimate business reason to forward the Dr. Rosenfeld Surgical Document to his personal email address.

107.    Haigh and Brown understood the value of the Dr. Rosenfeld Surgical Document.  On May 15, 2017, the same day that Haigh forwarded the document to his personal email, Haigh also documented in his Medicrea sales notes that another doctor in Arizona was interested in receiving that document so he could use Dr. Rosenfeld's Neuromuscular Scoliosis Surgical Technique.

108.    Additionally, the Dr. Rosenfeld Surgical Document, and the surgeon-specific technique described therein, has substantial value for K2M.    Since Medicrea launched LigaPASS®, K2M has been trying to play catch-up in launching and selling its own competing band connector.   Ultimately, K2M was unable to launch its band connector, known as NILE®, until February 2015.   Having access to the detailed surgical techniques described in the Dr. Rosenfeld Surgical Document will greatly assist K2M in marketing to Dr. Rosenfeld and to other spinal surgeons using band connectors.

### (b)   Brown and Haigh Communicate Repeatedly with K2M, Kinetic, and Furtek While Still Medicrea Employees

109.    Beginning in June 2017, Brown began using her Medicrea cell phone to communicate extensively (via phone call and text message) with Joseph Furtek, the Chief Executive Officer of Kinetic -- K2M's exclusive distributor and alter ego in Southern California. Records from the Medicrea cell phone assigned to Brown reveal the following communications with Joseph Furtek:

|             | # of Phone Calls | # of Call Minutes | # of Text Messages |
|-------------|------------------|-------------------|--------------------|
| June 2017   | 12               | 69                | 0                  |
| July 2017   | 38               | 257               | 1                  |
| August 2017 | 10               | 124               | 2                  |

110.    On July 20, 2017, Thomas, then a K2M sales representative, exchanged text messages to Haigh on his Medicrea cell phone.

111.    On September 24, 2017, a mere thirteen (13) days after sending their closely coordinated resignation notices to Medicrea, Brown and Haigh received an email from Furtek

that plainly revealed K2M's plans to include Brown and Haigh in their ongoing effort to steal business from Medicrea.

112.    Specifically, Furtek forwarded to Brown's personal email address a copy of an email that Furtek had sent that same day to multiple sales executives of K2M, including: Rick May, K2M's Area Director, Complex Spine Unit; Jay Rubin, K2M, VP of US Sales (West); Gary Palmer, K2M's North West Area Sales Director; and Caroline Weirich -- K2M's Director of Complex Spine.

113.    In that email, addressed specifically to Rick May, Furtek states:

> I want to thank you for the time this past week in orange county. Your meetings with [Dr. Afshin] Aminian and [Dr. Samuel] Rosenfeld **solidified our position in converting their business from Medicrea**. Both Lauren and Will were pressed very hard by the president of Medicrea this week with personalized exit interviews and guaranteed unreasonable amounts of money to stay. They shared with me, knowing they have such strong clinical support from someone like you makes their decision to move forward so much easier.

114.    That same day (September 24, 2017), Brown sent an email reply to Furtek, inadvertently copying Haigh (at his Medicrea email address), stating:

> Great email :) I'm very excited too!  Kiss your cute piggy for me ☐ - got a name yet?

115.    Following the receipt of Brown's email, and knowing that their competitive conduct was unlawful, Haigh quickly, but unsuccessfully, attempted to delete from his Medicrea email account all copies of Furtek's September 24, 2017 email and Brown's reply.

116.    Dr. Aminian and Dr. Rosenfeld are two of the leading users of Medicrea products in the United States.  For example, Dr. Aminian is a key leading user of Medicrea's UNiD™ and LigaPASS® in the United States.  Brown and/or Haigh personally attended approximately 70 surgeries conducted by Dr. Aminian using Medicrea UNiD™.

117.     Furtek's September 24, 2017 email communication with Brown and Haigh, while they were still Medicrea employees, plainly demonstrate not only the plans of K2M, Kinetic, Brown, and Haigh, to compete directly with Medicrea by "converting their [Aminian's and Rosenfeld's] business from Medicrea," but also action in furtherance of those plans – meeting with Medicrea's customers.     Such conduct is a blatant violation of the Non-Compete/Confidentiality Agreement that Brown and Haigh signed with Medicrea.

118.     On October 6, 2017, Brown returned to Medicrea her company-owned iPhone and laptop computer, but only after she had attempted to erase all records of her use of those devices by "restoring" them to their original factory-settings.

119.     On October 20, 2017, Brown, on behalf of K2M, bought lunch for Dr. Aminian and his staff and visited with him at his office.  Such conduct is a blatant violation of Brown's Non-Compete/Confidentiality Agreement with Medicrea.

120.     On October 23, 2017, Brown contacted Dr. Aminian again by placing a call to his personal cell phone.

**FIRST CAUSE OF ACTION**
(Violation of Defend Trade Secrets Act – 18 U.S.C. § 1836 - Against All Defendants)

121.     The allegations contained in Paragraphs 1-120 are incorporated by reference, as if fully stated herein.

122.     Medicrea owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.

123.     One example of that trade secret information is the numerous refinements Medicrea has made, since 2014, to the UNiD™ patient-specific rod and the UNiD™ process, and the reasons for those modifications (which includes feedback from customer-surgeons who worked directly with the Sales Employee Defendants while they were employed by Medicrea).

Paragraph 61 above sets forth several specific examples of Medicrea providing this highly-valuable trade secret information to the Sales Employee Defendants.

124.   During their employment with Medicrea, the Sales Employee Defendants each had access to, and acquired, such trade secret information about the refinements Medicrea has made regarding the UNiD™ patient-specific spinal rod.

125.   Another example of Medicrea's trade secrets is the specific information it has gathered regarding its customer-surgeons' techniques and experiences using Medicrea products, including UNiD™ and LigaPASS®.  Paragraphs 101-107 above set forth a specific example of the type of highly-valuable trade secret information that the Sales Employee Defendants have about the unique techniques and experiences of Medicrea's customer-surgeons.  As a further example, in August 2015, Brown communicated with Medicrea engineers and senior executives about: (a) feedback that she received from several surgeons she covered regarding these surgeons' experiences with the length of UNiD™ rods; and (b) Medicrea's process for manufacturing future rods for those surgeons.

126.   During their employment with Medicrea, the Sales Employee Defendants each had access to, and acquired, such trade secret information when they actively worked with the Medicrea customer-surgeons they covered on designing and/or surgically-implanting Medicrea products, including the UNiD™ patients-specific rod. For example, as noted above, Brown and/or Haigh personally attended approximately 70 surgeries conducted by Dr. Aminian using Medicrea UNiD™ patient-specific rod.

127.   Medicrea's confidential, proprietary, and trade secrets information relates to products, including UNiD™, and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and or ordered in, interstate or foreign commerce.

128.     Medicrea has taken reasonable measures to keep such information secret and confidential.

129.     For example, Medicrea requires its sales representatives and engineers in the United States, including the Sales Employee Defendants, to sign a Non-Compete/Confidentiality Agreement before any confidential or proprietary information is disclosed to them.  As part of those agreements, Medicrea's employees expressly agree that "without any limitation in time not to disclose to third parties confidential information concerning MEDICREA USA and its business activities."

130.     Medicrea also maintains a Code of Business Conduct and Ethics Policy ("Ethics Policy"), which applies to all Medicrea employees.   That Policy also contains provisions requiring employees to protect Medicrea's confidential information and intellectual property. Finally, many of the resources that the Sales Employee Defendants used to perform their jobs, such as training materials, product information materials, sales data, and data about customer-surgeons, are maintained by Medicrea in an online library with restricted access.

131.     Due to these and other security measures, Medicrea's confidential and proprietary trade secret information is not available for others in the spinal device industry – or any other industry – to use through any legitimate means.

132.     Medicrea's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

133.     For example, by learning the trade secret information that the Sales Employee Defendants possess regarding the specific refinements that Medicrea has made to the UNiD™

rod and process, and the particular surgeon experiences that prompted those refinements, K2M can substantially decrease the time, effort, and cost of launching and selling its own patient-specific spinal rod, to compete with UNiD™.

134.    Additionally, by learning the trade secret information that the Sales Employee Defendants possess regarding the surgical techniques and preferences of the particular surgeons they covered for using a patient-specific rod, K2M can substantially decrease the time, effort, and cost of achieving its goal of "**converting their business from Medicrea**" to K2M's competing products.

135.    In violation of Medicrea's rights, Defendants, as alleged herein, have: (a) misappropriated Medicrea's confidential, proprietary, and trade secret information in the improper and unlawful manner; and/or (b) used improper means to misappropriate the trade secret of as alleged herein.

136.    Defendants' misappropriation of Medicrea's confidential, proprietary, and trade secret information was intentional, knowing, willful, and malicious.

137.    Upon information and belief, if Defendants are not enjoined, they will continue to misappropriate and use Medicrea's trade secret information for its own benefit and to Medicrea's detriment.  For example, Defendants will continue to use Medicrea's trade secret information regarding the UNiD™ patient-specific rod and Medicrea's customer-surgeons who use UNiD™ to rapidly launch and sell their own K2M patient-specific rod, as well as to convert business away from Medicrea.

138.    As the direct and proximate result of K2M's conduct, Medicrea has suffered and, if K2M's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Medicrea's remedy

at law is inadequate, Medicrea seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Medicrea's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

139.    Medicrea has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees and costs.

**SECOND CAUSE OF ACTION**
(Breach of Contract – Against Sales Employee Defendants)

140.    The allegations contained in Paragraphs 1-139 are incorporated by reference, as if fully stated herein.

141.    The Non-Compete/Confidentiality Agreements are valid and enforceable agreements. The non-competition, non-solicitation, and confidentiality covenants contained in the Non-Compete/Confidentiality Agreements are reasonable and necessary to protect Medicrea's confidential information and trade secrets, goodwill, customer relationships, and other protectable interests.

142.    Medicrea has fully performed any and all of its obligations under the Non-Compete/Confidentiality Agreements.

143.    The Sales Employee Defendants received Medicrea's confidential information and specialized training in order to perform their responsibilities during the course of their employment with Medicrea.

144.    The Sales Employee Defendants' solicitation, sales, and/or services on behalf of K2M, as alleged herein, are in breach of the Non-Compete/Confidentiality Agreements.

145.    The Sales Employee Defendants' breach of the Non-Compete/Confidentiality Agreements has caused and will continue to cause Medicrea to suffer damages and irreparable

harm including but not limited to lost sales and damage to its goodwill and customer relationships.

### THIRD CAUSE OF ACTION
(Breach of Duty of Loyalty – Against Brown and Haigh)

146. The allegations contained in Paragraphs 1-145 are incorporated by reference, as if fully stated herein.

147. Brown and Haigh were employed by Medicrea in a position of trust and confidence, and therefore owed a duty of loyalty to Medicrea.

148. Brown and Haigh had access to and received confidential information belonging to Medicrea in the course of their employment.

149. Medicrea took reasonable steps to protect its confidential information from disclosure, including, *inter alia*, requiring its sales representative employees, including Brown and Haigh, to execute the Non-Compete/Confidentiality Agreements as a condition of employment.

150. Brown and Haigh competed against Medicrea while they were still employed as sales representatives of Medicrea.

151. For example, as set forth above in Paragraphs 111-117, Brown and Haigh, prior to their resignations from Medicrea on September 30, 2017, competed against Medicrea by communicating with managers of Kinetic, a third-party distributor of K2M's products, and K2M's sales managers, about particular surgeons they were covering as sales representative of Medicrea.

152. Brown and Haigh failed to disclose to Medicrea, either: (a) their communications, while still employees of Medicrea, with Furtek, Kinetic, and K2M; and (b) the plans of K2M,

Kinetic, Brown, and Haigh, to compete directly against Medicrea by "converting their [Dr. Aminian's and Dr. Rosenfeld's] business from Medicrea."

153.    Instead, Haigh quickly, but unsuccessfully, attempted to delete from his Medicrea email account all copies of Furtek's September 24, 2017 email and Brown's reply, which described the plans of K2M, Kinetic, Brown, and Haigh, to compete directly against Medicrea.

154.    Brown's and Haigh's communications with Kinetic and K2M, while employees of Medicrea, and direct and indirect solicitation of sales from Medicrea surgeons (including Dr. Aminian and Dr. Rosenfeld], breached their duty of loyalty to Medicrea, and have and will continue to cause damage and irreparable harm to Medicrea.

### FOURTH CAUSE OF ACTION
(Tortious Interference with Contractual Relations – Against K2M, and Kinetic)

155.    The allegations contained in Paragraphs 1-154 are incorporated by reference, as if fully stated herein.

156.    K2M had knowledge of the existence of the Sales Employee Defendants' non-disclosure, non-competition and non-solicitation obligations to Medicrea under the Non-Compete/Confidentiality Agreements before hiring any of the Sales Employee Defendants, and/or before Brown and Haigh were hired by K2M's distributor Kinetic.

157.    Kinetic had knowledge of the existence of the Brown's and Haigh's non-disclosure, non-competition and non-solicitation obligations to Medicrea under the Non-Compete/Confidentiality Agreements before recruiting them to sell K2M products, either as employees or K2M or Kinetic.

158.    K2M hired and continued to employ the Sales Employee Defendants, and encouraged Kinetic to recruit Brown and Haigh, despite its knowledge of their non-disclosure,

non-competition and non-solicitation obligations to Medicrea under the Non-Compete/Confidentiality Agreements.

159.   K2M recruited and hired the Sales Employee Defendants, and/or encouraged Kinetic to recruit and hire Brown and Haigh, to gain access to Medicrea's confidential information in order to develop and sell a patient-specific spinal rod that directly competes with Medicrea's UNiD™ product.

160.   K2M recruited Jackson, Thomas, Brown, and Haigh to sell K2M products, in order to convert business from Medicrea by improperly employing the individuals to directly and indirectly solicit the accounts and customers with whom they had contract during the prior twelve months of their employment with Medicrea in order to grown its sales.

161.   K2M's continued employment of Jackson, Thomas, and Artaki, and its aiding and abetting of Kinetic's continued employment of Brown and Haigh, is designed to induce the Sales Employee Defendants to continue to breach their contractual obligations to Medicrea.

162.   K2M's continued employment of Jackson, Brown and Artaki, and Kinetic's and Furtek's continued employment of Brown and Haigh, is improper in motive and means as it is being done with the intention of unfairly competing by using confidential information protected under the Non-Compete/Confidentiality Agreements and by unfairly capitalizing on the goodwill and customer relationships developed by Medicrea.

163.   K2M's and Kinetic's unlawful interference has caused and continues to cause irreparable harm and substantial damage to Medicrea.

## FIFTH CAUSE OF ACTION
(Unfair Competition – Against K2M)

164.   The allegations contained in Paragraphs 1-163 are incorporated by reference, as if fully stated herein.

165.    Medicrea and K2M are in direct competition in the development and sale of spinal products, including spinal implants, personalized spinal fusion products, and related surgical instruments.  Medicrea and K2M are the closet of competitors, given that both focus their efforts on complex spinal surgeries.

166.    Medicrea and K2M are in direct competition for qualified sales and engineering employees in the important are of spinal products.

167.    Medicrea possesses significant advantages over K2M in the area of personalized spinal fusion products.  First, Medicrea product UNiD™ is the first and only patient-specific spinal rod approved for use in the United States.  Second, Medicrea launched its band connector LigaPASS® in December 2013, more than fourteen (14) months before K2M was able to play catch-up by launching its competitor product NILE®.  Third, Medicrea possesses highly qualified and skilled sales employees who play an essential role in working with customer surgeons and Medicrea engineers throughout the technical process of designing UNiD™ patient-specific spinal rods.  Fourth, Medicrea possesses highly qualified and skilled field engineers who, among other things, assist in managing the end-to-end use of Medicrea's customized spinal products, and contribute to the development of new spinal products.  Fifth, Medicrea has devoted substantial resources to training its sales employees in the area of spinal products, including Medicrea's UNiD™ product, including but not limited by disclosing to them its proprietary and internal processes and confidential information.

168.    By contrast, K2M seeks to develop a patient-specific spinal rod for use in the United States by targeting and hiring highly-trained sales employees who have substantial experience working with the design, manufacturing, sale, and use of Medicrea's established UNiD™ patient-specific spinal rod through intentional wrongful conduct including, but not

limited to, using Medicrea's Confidential Information and undermining Medicrea's contractual and common law rights.

169.    K2M has also sought to destroy Medicrea's business operations, and to steal business from its existing and future customers (*i.e.*, Dr. Aminian and Dr. Rosenfeld), by targeting and hiring, in less than one-year, four highly-experienced sales employees who comprised 27% of Medicrea's sales force.

170.    K2M has also misappropriated Medicrea's skills, expenditures and labors in hiring key Medicrea sales representatives all of whom worked in, and directly supported, the development and sale of Medicrea's UNiD™ product.

171.    As a result of K2M's unfair competition, K2M is liable for damages resulting from its misconduct in an amount to be determined, but estimated at not less than several million dollars, plus an injunction that: (a) prohibits K2M, for a period of one-year, from soliciting for employment, directly or indirectly, any current Medicrea sales representative; (b) extends for one-year the time term of the non-solicitation and non-competition provisions in the Non-Compete/Confidentiality Agreements for each of the Sales Employee Defendants; and (c) prohibits K2M from using any of Medicrea's Confidential Information that may have been acquired by the Sales Employee Defendants.

## SIXTH CAUSE OF ACTION
(Civil Conspiracy -- Against All Defendants)

172.    The allegations contained in Paragraphs 1-171 are incorporated by reference, as if fully stated herein.

173.    Since November 2016, K2M has conspired with the Sales Employee Defendants, and Kinetic to unfairly compete against Medicrea, and to tortuously interfere with Medicrea's contractual and business relations.

174.   The goal of this conspiracy has been to: (a) gain access to Medicrea's confidential information in order for K2M to develop and sell a patient-specific spinal rod that directly competes with Medicrea's UNiD™ product; (b) destroy Medicrea's business operations by targeting and hiring, in less than one-year, Medicrea's U.S. Market field engineer and four highly-experienced sales employees who comprised 27% of Medicrea's sales force; and (c) to convert business from Medicrea by improperly employing the individuals to directly and indirectly solicit the accounts and customers with whom they had contract during the prior twelve months of their employment with Medicrea in order to grown its sales.

175.   In furtherance of this conspiracy, K2M and the Sales Employee Defendants have engaged in overt acts that included, but are not limited to:

    a.    Jackson, Thomas, Brown, and Haigh agreed to work as sales representatives of K2M, without appropriate restrictions, in violation of their Non-Compete/Confidentiality Agreements with Medicrea;

    b.    In November 2016, just days before resigning from Medicrea, Jackson forwarded confidential and proprietary UNiD™ product and sales information to his personal email address.

    c.    In December 2016, less than one-month after resigning from Medicrea, Jackson directly solicited business from Dr. Thomas Errico and Dr. Aaron Buckland, two spinal surgeons for whom he was responsible as a Medicrea sales representative;

    d.    On May 19, 2017, less than three-weeks after his resignation from Medicrea, Thomas, on behalf of K2M, contacted Dr. Sunil Manjila in an effort to try and pick up where they had left off when Thomas was a Medicrea employee. As the Medicrea employee responsible for coordinating and hosting VIP meetings, Thomas personally participated in face-to-face meetings with Dr. Manjila in New York in November 2016.

    e.    On May 15, 2017, prior to his resignation from Medicrea, Haigh forwarded confidential and proprietary information about Dr. Rosenfeld's use of Medicrea's LigaPASS® product to his personal email address.

f.    In September 2017, while still employed by Medicrea, Brown and Haigh communicated with Kinetic, K2M's distributor, about Kinetic and K2M's plans to compete directly against Medicrea by "converting their [Dr. Aminian's and Dr. Rosenfeld's] business from Medicrea."  Rather than disclose this information to Medicrea, Haigh attempted to delete from his Medicrea email account all evidence of those plans and communications.

g.    On October 20, 2017, Brown, on behalf of K2M, bought lunch for Dr. Aminian and his staff and visited with him at his office.  On October 23, 2017, Brown contacted Dr. Aminian again by placing a call to his personal cell phone.

h.    Given K2M's raid of Medicrea's sales force, combined with its aspirations to develop a patient-specific spinal rod, Medicrea has reason to believe that K2M will encourage Artaki to disclose Medicrea's confidential product information in order to expedite the development of its own competing products.

176.    K2M, the Sales Employee Defendants, and Kinetic have acted knowingly in carrying out this conspiracy, and with knowledge that their actions violate the Sales Employee Defendants contractual and common law obligations to Medicrea.

177.    K2M, the Sales Employee Defendants, and Kinetic, through their unlawful civil conspiracy, have caused and continue to cause irreparable harm and substantial damage to Medicrea.

## SEVENTH CAUSE OF ACTION
### (Aiding and Abetting – Against K2M, and Kinetic)

178.    The allegations contained in Paragraphs 1-177 are incorporated by reference, as if fully stated herein.

179.    As set forth above in Paragraphs 111-117, Brown and Haigh, prior to their resignations from Medicrea on September 30, 2017, competed against Medicrea by communicating with managers of Kinetic, a third-party distributor of K2M's products, and

K2M's sales managers, about particular surgeons they were covering as sales representative of Medicrea.

180.    Brown and Haigh failed to disclose to Medicrea, either: (a) their communications, while still employees of Medicrea, with Furtek, Kinetic, and K2M; and (b) the plans of K2M, Kinetic, Brown, and Haigh, to compete directly against Medicrea by "converting their [Dr. Aminian's and Dr. Rosenfeld's] business from Medicrea."

181.    Instead, Haigh quickly, but unsuccessfully, attempted to delete from his Medicrea email account all copies of Furtek's September 24, 2017 email and Brown's reply, which described the plans of K2M, Kinetic, Brown, and Haigh, to compete directly against Medicrea.

182.    Brown's and Haigh's communications with Kinetic and K2M, while employees of Medicrea, and direct and indirect solicitation of sales from Medicrea surgeons (including Dr. Aminian and Dr. Rosenfeld], breached their duty of loyalty to Medicrea, and have and will continue to cause damage and irreparable harm to Medicrea.

183.    K2M and Kinetic were aware that Brown and Haigh were still employees of Medicrea, owing a duty of loyalty to Medicrea, at the time they encouraged, on September 24, 2017, Brown and Haigh's departure from Medicrea and discussed their joint plans (along with Kinetic) to convert the business of Dr. Aminian and Dr. Rosenfeld aware from Medicrea.

184.    Moreover, as Furtek stated in his September 24, 2017 email to Richard May, K2M's Area Director: "[Brown and Haigh] shared with me [Furtek], knowing they have such strong clinical support from someone like you [Richard May] makes their decision to move forward so much easier."

185.   K2M, and Kinetic, through their aiding and abetting of Brown's and Haigh's breach of their duty of loyalty, have caused and continue to cause irreparable harm and substantial damage to Medicrea.

### RELIEF REQUESTED

WHEREFORE, Plaintiff, Medicrea, requests that the Court grant the following relief:

(1)   Enter relief in the form of a preliminary injunction, ordering:

    a.   Until further order of the Court or a date certain, Jackson, Thomas, Brown, and Haigh be enjoined from:

        i.   Directly or indirectly soliciting or selling to, servicing, delivery product to, attending or covering surgeries at, communicating with, or acting as a sales representative for K2M, or any manufacturer of spinal products at the Restricted Accounts or with respect to any surgeon affiliated with or performing surgeries at one of the Restricted Accounts, regardless of the location at which a surgery is performed;

        ii.   Assisting K2M, including any employee or contractor of K2M, or anyone else to solicit or sell spinal products to the Restricted Accounts, regardless of the location of where a surgery is performed;

        iii.   Consulting with or communicating with K2M, including any employee or contractor of K2M, or anyone else concerning the sale of spinal products to the Restricted Accounts or any surgeon

affiliated with or performing surgeries at one of the Restricted Accounts, regardless of where a surgery is performed; and

iv.     Using or disclosing the confidential information of Medicrea.

For purposes of this injunction, the Restricted Accounts for Jackson, Thomas, Brown, and Haigh respectively shall mean at least:

(a)     Jackson Restricted Account shall include, at least (i) the following hospitals: Hospital for Special Surgery; NYU Langone Orthopedic Hospital (formerly known as Hospital for Joint Diseases); Columbia University Medical Center; Crouse Hospital; Montefiore Medical Center; Tisch Hospital; Stony Brook University Hospital; Stony Brook Children's Hospital; Stony Brook Southampton Hospital; and Stamford (Connecticut) Hospital; and (ii) the following surgeons: Frank Schwab, Peter Passias, Ashish Patel, Themistocles Protopsaltis, John Labiac, Hanjo Kim, John Bianco, Roger Widmann, Jamie Gomez, Aaron Buckland, Raphael Davis, Michael Smith, Thomas Errico, Ashish Patel, and Charla Fisher.

(b)     Thomas Restricted Account shall include, at least (i) the following hospitals: Hospital for Special Surgery; NYU Langone Orthopedic Hospital (formerly known as Hospital for Joint Diseases); Columbia University Medical Center; Crouse Hospital; Montefiore Medical Center; Tisch Hospital; Stony Brook University Hospital; Stony Brook Children's Hospital; Stony Brook Southampton Hospital; and Stamford (Connecticut) Hospital; and (ii) the following surgeons: Frank Schwab, Peter Passias, Themistocles Protopsaltis, John Labiac, Raphael Davis, and Aaron Buckland.

41

(c)     Brown Restricted Account shall include, at least (i) the following hospitals: Banner Desert Medical Center; Banner Good Samaritan; Children's Hospital- Madera; Children's Hospital in Los Angeles (CHLA Hospital); Children's Hospital in OC (CHOC Hospital); Eisenhower Medical Center; Hoag Orthopedic Institute; Huntington Memorial Hospital; Marina Del Rey; Mission Hospital Laguna Beach; Mission Hospital Viejo; Northridge Medical Center; Saddle Back Memorial Laguna Hills; Scripps Memorial Hospital – La Jolla; Silver Lake Medical Center; Sky Ridge Medical Center; St Joseph Hospital – Orange County; St Joseph Hospital and Medical Center Phoenix; St Jude Fullerton; Surgical Center of Castle Rock; UCI Medical Center; UCSF Medical Center; University of Washington; Valley's Children Hospital; and Westside Surgical Hospital; and (ii) the following surgeons: Michael Eliot, Afshin Aminian, Kim Keun-Young, Ejovi Ughwanogho, Reginald Fayssoux, Raed Ali, Samuel Rosenfeld, Zafar Khan, Joe Lee, Yu-Po Lee, and Steven Dennis.

(d)     Haigh Restricted Account shall include, at least (i) the following hospitals: Banner Desert Medical Center; Banner Good Samaritan; Children's Hospital-Madera; Children's Hospital in Los Angeles (CHLA Hospital); Children's Hospital in OC (CHOC Hospital); Eisenhower Medical Center; Hoag Orthopedic Institute; Huntington Memorial Hospital; Marina Del Rey; Mission Hospital Laguna Beach; Mission Hospital Viejo; Northridge Medical Center; Saddle Back Memorial Laguna Hills; Scripps Memorial Hospital – La Jolla; Silver Lake Medical Center; Sky Ridge Medical Center; St Joseph Hospital – Orange County; St Joseph Hospital and Medical Center Phoenix; St Jude Fullerton; Surgical

Center of Castle Rock; UCI Medical Center; UCSF Medical Center; University of Washington; Valley's Children Hospital; and Westside Surgical Hospital; and (ii) the following surgeons: Afshin Aminian and Samuel Rosenfeld.

    b.    Until further order of the Court, or a date certain, K2M and Kinetic be enjoined from:

        i.    Employing or engaging, directly or indirectly, Jackson, Thomas, Brown, and Haigh in any capacity identified in sub-paragraph (a);

        ii.    Soliciting for employment, directly or indirectly, any current Medicrea sales representative; and

        iii.    Soliciting the disclosure of Medicrea's confidential information from the Sales Employee Defendants, or using Medicrea's confidential information.

(2)    Enter judgment in favor of Medicrea on Counts I though VII of the Complaint

(3)    Award all monetary damages determined at trial;

(4)    Enter permanent injunctions in the form identified in (1) above, or in a form the Court otherwise deemed just and proper;

(5)    Award Medicrea its attorneys' fees, costs, and expenses; and

(6)    Award such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial

on all issues so triable.

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

By: _____

Marc S. Raspanti, Esquire
(N.Y. I.D. No. MR1193)
Michael A. Morse, Esquire
(Pro hac vice pending)
(N.Y.I.D. No. 4591400)
Joseph L. Gordon
(N.Y.I.D. No. JG5973)

1818 Market St., Suite 3402
Philadelphia, PA 19103
T (215) 320-6200
F (215) 981-0082
msr@pietragallo.com

CLAYMAN & ROSENBERG, LLP

Thomas C. Rotko, Esquire
(N.Y. I.D. No. TR9339)
Wayne Gosnell, Esquire
(N.Y.I.D. No. WG2422)

305 Madison Avenue, Suite 1301
New York, NY 10165
T (212) 922-1080
F (212) 949-8255
rotko@clayro.com

Attorneys for Plaintiff
Medicrea USA, Corporation

Date: November 8, 2017

3460549v7

44

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MEDICREA USA, Inc. | : | |
| | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO.: _____ |
| | : | |
| v. | : | |
| | : | |
| K2M SPINE, INC. | : | Hon. _____ |
| CHAD JACKSON, THOM THOMAS, | : | |
| LAUREN BROWN, WILLIAM HAIGH, and | : | |
| KINETIC SURGICAL, INC., | : | |
| | : | |
| Defendants | : | |
| | : | |
| | : | |
| | : | |

## <u>VERIFICATION</u>

I, Pierre Olivier, am the Chief Executive Officer of Medicrea USA, Inc., Plaintiff herein,

and hereby verify that I am authorized to make this verification on behalf of Plaintiff Medicrea

USA, Inc., and that the facts set forth in the foregoing Complaint are true and correct to the best

of my personal knowledge, information, and belief.

This verification is made pursuant to 28 U.S.C. § 1746.



_____
Pierre Olivier

3483533-v1

# EXHIBIT A

**Chad Jackson**
6 stuyvesant oval apt 5F
New York, NY, 10009
Cell = 317 696 3319
Email = chadjackson82@ymail.com

March 23rd, 2015

Re: Contingent Offer of Employment

Dear Chad,

We are pleased to extend you an offer to join MEDICREA USA, Corp. (hereafter the "Company" or "MEDICREA USA") as a Spine Deformity Consultant in responsible for the NE region (New york area), beginning on or before **Tuesday April 21st, 2015**. We believe you will make a tremendous contribution to the company and welcome the opportunity to work with you and achieve our shared professional goals within the coming years.

<u>**POSITION**</u>

As a Spine Deformity Consultant, you will report directly to the Northeast Regional Director of MEDICREA USA. Your territory will be finalized with your regional director. While the focus is the New York area, it is not limited to it and can extend to other regions.

The Company may add or subtract surgeons you cover as needed to make sure there is adequate coverage of the various states and regions. You may also cover surgeons out of your territory. As you proceed with MEDICREA USA, your position and assignments are subject to change.

Your employment relationship with MEDICREA USA is of an "AT WILL" nature. This means we cannot guarantee employment for any specific duration. Either party may end the working relationship at any time with or without notice, and with or without cause. In addition, the Company retains the right to add, change or delete bonus or commission structure, territory boundaries, benefits, policies and all other working conditions at any time. This provision can only be changed or revoked in writing signed by the Chief Executive Officer, and cannot be changed by any express or implied agreement based on statements or actions by any employee or supervisor.

<u>**DUTIES**</u>

As a **Spine Deformity Consultant**, you will exert your full time and energy to your duties and responsibilities as described hereafter:

- Be the technical expert on the product and instrument to be able to provide case coverage during any surgery. The Spine deformity Consultant needs to build a close relationship with the surgeons he/she supports.
- Develop close relations with the scheduler and get 30-60 days visibility and commitment on surgery dates. Get this information populated into salesforce.com.
- Be responsible for any direct surgery in your specified territory: Join 100% of the case, secure everything is ready for the case, on call for emergency of any nature in the 48hrs before the case, secure all administrative facets are completed on time (POD Day of Case, PO# within 48Hours,etc)
- Secure all the administrative tasks are covered and completed after the case and renewed or updated at the Hospital (contract, Pricing, consign contract,)



- Any spare time will be either used to cover other cases, attend initial cases with or without distributors, support complex cases and learn the role of Regional Director by assisting Regional Director in the conversion of additional surgeons.
- Every Friday by 5PM, confirm your schedule for case coverage with your assigned surgeons for the following week with the Regional director and / or VP of Sales. The VP of Sales will work with you in allocating you to the most critical surgeon meetings in order to achieve our business goals and your development plan at Medicrea.
- Based on your surgical experience, we expect you to proactively feed input to marketing in order to help them define and refine better and differentiate surgical technique and selling tools.

## PLACE OF WORK

Your primary place of work will be your home in New York, NY. We expect significant amount of travel to take place for you to be successful in the territory, up to 5 days per week. You may be required to travel and work at other locations to meet the Company's business needs. You will for instance travel on a regular basis to the different places where the Company may develop its business, including upon request to the NY headquarters.

## COMPENSATION

### 1- Base salary

You will be entitled to an annual base salary of                   paid in 24 equal semi-monthly installments. your base salary will be increased to . . . . .      year if you hit the following 3 milestones:

- Your monthly run rate of UNID paid cases is at least 10 cases for 2 consecutive months
- you have converted a surgeon to PASS-Lp which means the surgeon has done a minimum of 3 screws cases per month for 2 consecutive months
- You are certified and been observed at least by the National trainer or your manager to cover successfully a complex deformity case, using PASS LP system

### 2- Bonus

Bonus is calculated on the performance of every month, and paid at the end of the following month. Your bonus structure is:

- of the gross revenue of the direct (no distributors) cases, covered by you.
- on all revenue on the UNID rod in your region for 2015
- There is no cap on your bonus.
- Your bonus starts, when you have been certified capable of covering a Medicrea case on your own and officially removed from your training program. Certification is given by your Regional Director and by the Executive President in charge of surgeon relation, observing you during a case, you cover.

### 3- Guarantee bonus

- Medicrea will guarantee you a cumulative bonus of           per month for the first two months of employment. There will be an opportunity to renew for an additional two months, if the milestones defined between you and your manager during week 1 and for month 1 and 2 are met or exceeded. There will be an opportunity to renew for an additional two months, if the milestones defined between you and your manager during week 9 and for month 3 and 4 are met or exceeded.
  The milestones are to be shared and reviewed by the VP sales and CEO.
- This is a guarantee, not a draw.
- Bonus are paid at the end of the following month.



## BENEFITS

You will be eligible on the 1st of the month following thirty (30) days of continuous employment to participate in the Company's health and benefit plans, subject to terms, conditions, and limitations contained in the applicable plan documents and insurance policies.

1-Vacation benefits are framed by the Company's internal policy manual and may change depending on the revisions of the manual.
You will be entitled to 1.25 days of vacation per month, which comes to three weeks vacation per calendar year going to four weeks after five years employment. Accrued days will not be carried over into the following year nor will they be paid back if not used during the calendar year.
Please note that Medicrea USA will be closed for business for 10 days of holidays in 2015. The calendar will be communicated to you at your 1st day.

2: 401K: You will be eligible to make contributions to the Company's 401(k) Plan as per defined in the internal policy manual, which included a company matching against your contribution.

3- Car allowance. You are entitled to a car allowance of        gross per month. We expect the large majority of your travel to take place by either subway or car, unless directed differently by your regional director or VP of sales.

4- Health coverage. You will be entitled to join the health coverage solution, offered by our pay roll provider ADP, which offer best in class option with most of the premium covered by Medicrea. The health plan will start on June 1st due to the mandatory enrollment period.

5: ESPP Plan: You will be eligible to make contributions to the Company's ESPP Plan. You can join the plan, once you have at least 24 months of employment at Medicrea.

## BUSINESS EXPENSES

MEDICREA USA will reimburse you, upon receipt, for reasonable and necessary business-related expenses directly related to the performance of your work.

## EXCLUSIVITY

As an employee of MEDICREA USA, you will exert your full time and energy to MEDICREA USA, which will be your sole and only employer. Unless formal approval (email) by your manager, you will focus 100% of your work time on your job and not pursue any other personal ventures.

## YOUR CERTIFICATIONS TO MEDICREA USA

As a condition to your employment, you certify to MEDICREA USA that:

- You are free to enter into and fully perform the duties of your position and that you are not subject to any employment, confidentiality, non-competition or other agreement that would restrict your employment by MEDICREA USA.
- You have not disclosed and will not disclose to MEDICREA USA any proprietary, trade secret or confidential information belonging to your previous employer or any other third party;
- You have removed no documents or data from a prior employer or a third party, and you are in compliance and will remain in compliance with any obligations of confidentiality to a third party;
- All information you have presented or will present to MEDICREA USA is accurate and true. This includes, but is not limited to, all oral and written statements you made, including those pertaining



to your education, training, qualifications, licensing and prior work experience, on any job application, resume or CV, or in any interview or discussion with MEDICREA USA.

A. CONTINGENCES

Should you wish to accept this offer, it is contingent upon the following:

- Reading & signing the MEDICREA USA Contingent Offer of Employment and the related Confidentiality and Non Compete Agreement;
- Your satisfactory completion of all elements of the pre-employment process including the background & reference checks;
- Taking and passing a compulsory urinalysis drug test;
- Reading & signing the MEDICREA USA job description.
- Reading & signing the MEDICREA USA Code of Conduct; Reading MEDICREA USA Internal Policy Manual.
- Upon date of hire, providing documents to prove eligibility to work in the United States as per the Immigration Reform and Control Act (IRCA 1986);
- Proof of automobile liability and property damage insurance in your state;
- Proof of a valid Driver's License.
- MEDICREA USA also needs your Social Security Number information and a Void Check to process your first payroll.

This letter sets forth the entire offer between you and the Company. Once signed by you, it will supersede all prior discussions and negotiations. To confirm that you agree to the terms stated in this employment offer, please sign and date the enclosed copy of this letter and return it MEDICREA USA as soon as possible.

We look forward to your joining the team at MEDICREA USA. We feel certain that your employment will constitute the beginning of an exciting and challenging opportunity. If you have any questions, please contact us.

Sincerely,
Pierre OLIVIER
CEO, Medicrea USA

Pierre OLIVIER                    Date:  4-30-15              Signature:

Chad A Jackson                    Date:                       Signature:

                                  4/30/15

Chad A. Jackson

## NON-COMPETITION AND CONFIDENTIALITY AGREEMENT

### PARTIES

THIS NON COMPETITION AND CONFIDENTIALITY AGREEMENT (hereinafter "Agreement") is made this March 6th 2015, between

MEDICREA USA Corp. (hereinafter the "Company" or "MEDICREA USA"), a Delaware corporation, having a principal place of business at 50 Greene Street, 5th floor, New York, NY, 10013

And

Chad Jackson, 6 Stuyvesant oval, New York, NY

### NON-COMPETITION

You undertake not to, directly or indirectly, during your employment and for a period of one (1) year after the termination of your employment by MEDICREA USA, solicit or attempt to solicit any of the Company's employees, customers, agents, distributors, suppliers or other business partners, away from the Company. The present activity of the company is the selling of spinal implants.

You further undertake, during your period of employment and for a period of one year after the termination of your employment not to, directly or indirectly, conduct or in any manner participate to further activities, which compete with the present, or future business activities of the Company, within your area of responsibility, at the time of termination. Specifically but not limited to any surgeon in the USA with whom you had a face to face meeting or with whom you did cover a surgery during the last 12 months, will be part of your territory.

The Company will enforce that non-competition clause, unless a written agreement is signed by both parties, no later than 15 working days from the date of receipt of the written or email confirmation that one or the other party terminates your contract.

Also, you will be required to indemnify MEDICREA USA, in regard to any potential litigation or other damages in connection with any claimed violation of your non-competition agreement with previous employers. The law of the state of New York applies in cases of any litigation.

### CONFIDENTIALITY

You agree without any limitation in time not to disclose to third parties confidential information concerning MEDICREA USA and its business activities.

"Confidential information", as used in this provision, means any information - technical, commercial with current or potential customers, or of any other nature - regardless of whether or not the information is documented, with the exception of information which is or becomes generally known or which has come or comes to general knowledge other than through the Employee's breach of this provision.

Sincerely,

Chad Jackson

Date:

4/30/15

Pierre OLIVIER

CEO, MEDICREA USA

Date: